IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 28, 2021

## MILLARD ELLIS SPURGEON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Sevier County**
**No. 19269    James L. Gass, Judge**

———————————————————

**No. E2020-01328-CCA-R3-PC**

———————————————————

Petitioner, Millard Ellis Spurgeon, appeals the denial of post-conviction relief from his 2015 Sevier County convictions for burglary, theft of property valued at $1,000 or more, vandalism of property valued at $1,000 or more, and possession of burglary tools, for which he received an effective sixteen-year sentence. Petitioner argues that he was denied the effective assistance of counsel at trial. After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Susan H. Harmon, Sevierville, Tennessee, for the appellant, Millard Ellis Spurgeon.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Jimmy B. Dunn, District Attorney General; and George C. Ioannides, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

On direct appeal, this court summarized the facts at trial, as follows:

> The Sevier County Grand Jury charged [Petitioner] and David Way via presentment with one count each of burglary, theft of property valued at $1,000 or more, vandalism of property valued at $1,000 or more, and

possession of burglary tools for his role in the August 19, 2012 break-in at Gatlinburg-Pittman High School.

At the December 16, 2015 joint trial, Gatlinburg-Pittman High School principal Tony Ogle testified that at approximately 5:00 a.m. on Sunday August 19, 2012, the school's security monitoring firm notified him by telephone that an alarm had been triggered at the school. Mr. Ogle confirmed that he wanted the police dispatched to the school, and he dressed quickly and drove to the school. When he arrived, a number of officers from the Gatlinburg Police Department ("GPD") were present. Mr. Ogle entered the school with officers and reviewed the video footage from the school's security cameras. On the video, Mr. Ogle observed two perpetrators use various tools to break into the ATM, soft drink vending machines, and a change machine. The perpetrators wore dark or camouflage clothing, hoods, masks, and gloves. The shorter of the two perpetrators had a very distinctive gait. Mr. Ogle explained that the individual "display[ed] a kick of his heels where he raises the heel up to touch the back of his leg or his thigh." The perpetrators used pry bars, pliers, a tool with a forked end, and a chisel to break open the ATM. After opening the ATM, the individuals pried open the "cash cassette" or money box and pocketed its contents. They then cleaned up the area, and the taller of the two used a spray bottle to clean the floor. Mr. Ogle said that the perpetrators entered through a window in the teacher's lounge.

Mr. Ogle said that he did not recall any officer's having collected any evidence from the school on August 19 but that the school was locked after he and the officers left the school. On the following day, a Monday, school was in session. Mr. Ogle said that he and a school janitor cleaned up debris from the floor before students arrived and made efforts to cordon off the ATM until the police could collect it.

GPD Detective Gary McCarter responded to the high school on August 19. He reviewed the video surveillance with Mr. Ogle and observed damage to the ATM, vending machines, and change machine. He did not collect any evidence from the school that day and took no steps to preserve the scene because "[t]he school was secured. It was locked down that day because there were no kids there, so it was locked up." After leaving the school that morning, Detective McCarter went to McKinney's Market, where he told clerk Jamilla Byrd about the burglary and asked her to be on the lookout for the perpetrators. He described the clothing they wore in the video surveillance and demonstrated the peculiar gait of the shorter perpetrator. A

- 2 -

few hours later, Ms. Byrd telephoned and told him that a man displaying such a gait had entered the market. Detective McCarter dispatched uniformed patrol officers to the market and then drove there himself.

When Detective McCarter arrived at McKinney's Market, he found [Petitioner] and Mr. Way being questioned by the uniformed patrol officers. After being provided with *Miranda* warnings, Mr. Way consented to a search of the van in which the men had been traveling. Inside the van, Detective McCarter found "a box of tools" and wet clothing that was "very similar to" the clothing worn by the perpetrators in the surveillance video, including "several pair" of gloves that were "similar to the ones that you'll see in the video. They have the white writing on them." Detective McCarter recognized among the tools he collected a "pry bar" that was the same type of tool carried by the perpetrators in the surveillance video. Detective McCarter also recognized a chisel and a "bearing puller" "that appear[ed] to be similar" to the one used to open the ATM machine. He acknowledged that he did not find masks, backpacks, or large sums of money inside the vehicle.

Both men provided written statements detailing their whereabouts for the previous evening. [Petitioner and Mr. Way] told Detective McCarter that "[t]hey had been home and they were taking that vehicle to work on somebody's car or they had been working it, taking it back, something like that." Detective McCarter took the items he collected to the Gatlinburg Police Department, photographed them, and put them into his office. He did not wear gloves when collecting the tools and did not individually tag them at that time. He then telephoned Mr. Way's mother, who told the detective that Mr. Way had been home all night. When he finished, Detective McCarter left to go out of town, and Detective Rodney Burns took over the investigation.

Jamilla Byrd testified that Detective McCarter, who was a regular customer at McKinney's Market, came in on the morning of August 19, 2012, and told her about the burglary at the high school. She said he described the perpetrators to her: "The first one he said was kind of tall and had a lazy eye, and he said the second one had a very distinct characteristic. He was short and then he did a leg kick behind him." At approximately 11:00 a.m. that same morning, "a gentleman came in and wanted to get lottery tickets." She said that the man, whom she identified as Mr. Way, spent "roughly about two or three hundred dollars" buying lottery tickets and that he remained inside the store for 10 to 15 minutes while buying and cashing

in his various tickets. While Mr. Way was in the market, another man came in with lottery tickets, and Ms. Byrd observed the man, whom she identified as [Petitioner], "standing at the counter kicking his legs back like" Detective McCarter had demonstrated.

Detective Burns testified that on August 20, 2012, "[t]he chief told [him] to go ahead and begin to start investigating it because Detective McCarter had started vacation." Detective Burns began his investigation with a trip to the high school, where he photographed the damaged ATM machine and vending machines. Detective Burns also "collected some chippings of the metal on the floor, some pieces of the paint" from the area around the ATM and "a little bit of dirt off the window sill" of the "window in the rear of the school" that was the apparent entry point used by the perpetrators. After photographing the machines and collecting the other evidence, Detective Burns "unbolted the ATM from the floor" using a wrench that he borrowed from someone on the maintenance crew at the school and then asked some "school maintenance workers for the county" to "cut the pieces [he] wanted cut off" of the ATM using a blow torch.

Detective Burns gathered all of the items into his vehicle and transported them to the police station, where he "wrapped up the pieces of the ATM" with thick, brown paper "and taped them, secured them and" placed them in his office. Later that day, he interviewed [Petitioner], who told him that he had spent the previous evening at his aunt's house on Chelan Drive. When the detective asked about the clothing and tools discovered inside the van, [Petitioner] said "something along the fact, you mean you're going to charge me with this based on that?" In a separate interview, Mr. Way told Detective Burns that he worked as a mechanic and sometimes borrowed his mother's van to go to various jobs but "that he was basically having it rough financially at that time, that he didn't have any money and that he was on food stamps." Mr. Way claimed ownership of the clothing and tools discovered inside his mother's van and explained that the clothing in the van had become wet because it had been l[y]ing out on the ground all night. Mr. Way said "that he had loaded" the tools and clothing into the van that morning "to take with him" to work.

On the following day, Detective Burns returned to the police department and retrieved the tools from Detective McCarter's office. Wearing gloves, Detective Burns wrapped the tools individually in thick, brown paper and presented them to the evidence clerk to be placed into the evidence locker at the police department. He also placed the wrapped

- 4 -

portions of the ATM into the evidence locker.  Detective Burns transported the ATM pieces, tools, clothing, and other items to the Tennessee Bureau of Investigation ("TBI") on October 24, 2012.  He took "a drink bottle and some swabs" to the Knoxville TBI office and the remaining items to the Nashville TBI office, explaining, "Knoxville does DNA testing, but Knoxville does not do ballistic testing or tool mark testing."  After he retrieved the items from the TBI, he took them back to the evidence locker.

Detective Burns testified that he did not attempt to obtain fingerprints from the ATM, vending machines, or tools because the video surveillance clearly showed the perpetrators wearing gloves.  He acknowledged having wiped some of the smaller tools "that were down inside the toolbox . . . because . . . they had the power steering fluid and all that on them."

TBI Special Agent and Forensic Scientist Randall Nelson collected paint scrapings from several tools and "did an analysis to compare the paint" collected from the tools "to the paint on the ATM pieces."  Ultimately, Agent Randall determined that the paint collected from two pry bars "could not have come from the ATM" but that paint collected from a chisel and a "forked tool" "was consistent with the paint from the ATM with respect to color, type, texture, binder composition and pigment composition."  He concluded that "the paint scrapings" on the chisel and the forked tool "could have come from the ATM represented by Exhibits 3A and 4A, or another object with the same paint history."

TBI Special Agent and Forensic Scientist Teri Arney performed tool mark examinations on the tools and ATM after Agent Randall finished his analysis.  Agent Arney used a silicone casting medium to preserve the microscopic characteristics of each individual tool and created "test tool marks" by striking the tool on a sheet of lead.  She found usable tool marks "on the door of this ATM" and matched three of the tool marks to the forked tool.

Tennessee State Bank electronic banking manager Stephanie Randles testified that she was responsible for the management of offsite ATMs, including the one at Gatlinburg-Pittman High School.  Ms. Randles said that the ATM was damaged beyond repair, and "a new one had to be purchased, and the total for that was" $3,600.  At the time of the burglary, the ATM contained $1,540.

- 5 -

Based upon this evidence, the jury convicted [Petitioner] and Mr. Way as charged.

*State v. Millard Ellis Spurgeon*, No. E2016-02210-CCA-R3-CD, 2018 WL 2193240, at \*1-3 (Tenn. Crim. App. May 14, 2018) (footnote omitted), *no Rule 11 app. filed*. This court affirmed the judgments of conviction on appeal. *Id.* at \*6.

Thereafter, Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, two amended petitions were filed.

At an evidentiary hearing, trial counsel testified that he represented Petitioner during his December 2015 jury trial. Trial counsel explained that, as part of discovery, he received an audio recording of Petitioner's interview with Detective Burns. Trial counsel stated that he decided to use part of the recording to attack Detective Burns' investigation, which was part of counsel's trial strategy. Trial counsel recalled that he cross-examined Detective Burns on the detective's failure to: ensure that the scene at the ATM was secured; timely send the machine to the TBI for testing; make certain that workers handled the ATM while "taking necessary precautions[;]" and investigate Petitioner's alibi. Trial counsel said that he had also intended to cross-examine Detective Burns about lies the detective told Petitioner during his interview in an attempt to get Petitioner to confess. Trial counsel explained:

> And during the interview Detective Burns had informed [Petitioner] that they had already matched the tool marks from the tools they had seized to the ATM housing, which was a lie. So . . . the portion of the audio that I played was when he made that statement to [Petitioner].
>
> Unfortunately, as soon as he said it, it was like I couldn't stop the recording in time before the statement . . . came out where [Detective Burns] mentioned something about being a convicted felon.

Trial counsel said that he knew the comment about Petitioner being a convicted felon was on the recording and that he intended to stop the recording before that comment. He explained, however, that the audio recording was played on a laptop computer and that the computer would not respond when he attempted to stop the recording.

Trial counsel did not request a mistrial or ask for a curative instruction. Trial counsel testified:

> The way I saw it, I didn't think it would be enough for a mistrial, and I felt that if I asked for a limiting instruction that it w[ould] just call more

attention to it to the jurors if any of them had heard it. Or if any of them hadn't if the judge gives a limiting instruction, then you can be sure they all heard it. So it was just a tactical decision in the moment.

Trial counsel said that he "thought it would be best to pursue the cross-examination" at that point, and he asked Detective Burns about the lie and how, "even in the face of that lie, [Petitioner] still denied having had any involvement in [the] matter."

On cross-examination, trial counsel said that he had practiced law for eighteen years and that his work in the area of criminal defense was "pretty extensive." Trial counsel agreed that the jury was shown the film of the "unique walk of the perpetrator at the Gatlinburg-Pittman High School[.]" Trial counsel described the walk as "almost like a nervous tick, like kind of a heel kick when he would take certain steps." Trial counsel agreed that, at a traffic stop of Petitioner, Petitioner was wearing a "very similar if not the same" shirt as one of the perpetrators in the video footage of the offense. He said that the State also offered proof about the paint similarities between the paint on the ATM and that found on the tools in Petitioner's possession, as well as testimony that the tool marks on the ATM matched one of those tools. He noted that he also offered the preliminary hearing testimony of Petitioner's alibi witness to the jury.[1]

Jessica Sisk testified that she was a licensed attorney and that she was co-counsel for Petitioner's co-defendant during the trial. Ms. Sisk recalled the portion of trial counsel's cross-examination during which he played the audio recording of Detective Burns' interview with Petitioner. She recalled that the recording was played on the State's laptop computer and that a courtroom microphone was placed by the laptop. She said that she was sitting at the defense table when it was played and that she heard Detective Burns' comment.

At the conclusion of proof, the post-conviction court stated:

> The Court does find that . . . [Petitioner] . . . was identified in the proof for the jury at trial as the person who had an unusual step or walk wherein . . . one leg would kick much higher, almost as though . . . he was kicking himself with his heel as he took steps that were observed by the police department. That observation of that characteristic was observed by a store employee near Gatlinburg which had been forewarned to be on the lookout by detective of anyone with that particular type of walk. It was also shown from the testimony here that there was an individual recorded by security tapes at the Gatlinburg-Pittman High School . . . that one of the two

---

[1] Trial counsel testified that Petitioner's alibi witness died before trial.

individuals there, although wearing masks, had a unique walk like [Petitioner] had which was recognized by the store employee and, later, officers of the Gatlinburg Police Department.

This Court also heard testimony that there was camouflage in the video worn by the two individuals that broke into the Gatlinburg-Pittman High School, and that camouflage of a consistent or similar pattern was in the possession of [Petitioner] and the same was shown to be the case at trial, including a leaf pattern in the camouflage from the garments or garment taken from [Petitioner's] vehicle . . . .  There was also evidence in this record that . . . after the break-in . . . there was evidence of gauge or scratch marks from tools on an ATM at the high school.

. . .

There was also testimony that the gauge or scratch marks on the ATM were caused by the tools possessed by [Petitioner] and his co-defendant . . . .  The Court recognizes that that type of proof can be very damaging . . . for the defense of an individual if offered at a criminal trial.

. . . .

The Court recognizes that [trial counsel] had a strategy in this case and that was . . . to display to the jury flaws or inconsistencies in the investigation . . . by the Gatlinburg detectives to turn up and expose to this jury things that maybe they should have done or did not do properly.  As part of that plan, he offered the playing of this tape to show, and it was his intent in doing so, that the detective was lying to [Petitioner] during the course of this investigation . . . and further to show that the detective ignored an alibi witness or witnesses that could have assisted in exonerating [Petitioner]. This Court finds that those are reasonable and proper measures taken by [trial counsel] in the course of this defense.

To further that, it was [trial counsel's] expectation that he could play only a short portion of this audiotape to enable the jury to hear the spoken word about the lie . . . .  Unfortunately for [trial counsel], the machine in which he was playing these remarks did not respond to his command to stop. It was not his intention . . . to play to the jury any remark by Detective Burns . . . that says "You're a convicted felon."  However, . . . despite the best efforts of [trial counsel] . . . he was not able to stop this recording and [ ] some recorded sound with that type of verbiage was exposed to this jury[.]

- 8 -

. . .

[Trial counsel] has explained his logic, and the Court so finds that logic to have been reasonable. It . . . would have been in hindsight . . . to have asked for a curative instruction from the Court to disregard any portion of the recording that might have reflected a conversation about [Petitioner's] prior history . . . but that was not done. This Court, however, does not find that that omission by [trial counsel] was ineffective assistance of counsel. He has stated his reasons, that that would be tantamount to ringing the bell once again and hammering home . . . that his client might well be a convicted felon. And this Court can appreciate that logic, although I believe the curative measure would have been the best course to take.

. . . .

The Court further finds that even if [trial counsel's] actions in failing to ask for a curative instruction from the Court because the machine did not respond correctly, even if that rose to ineffective assistance of counsel, this Court cannot find in any place in this record that that action in any way would have changed the outcome of this case. To have a video . . . of an individual with a unique walk, an individual wearing a unique set of clothing, and an individual with that same walk and in possession of that same unique clothing and in possession of tools that are matched to the damage on an ATM within the building burglarized all within a short period of time and geographic proximity to the burglary would be overwhelming proof in the eyes of this Court of [Petitioner's] guilt.

So this Court concludes . . . that the actions of [trial counsel] . . . would have had no effect on the outcome of the jury's decision in this case in convicting [Petitioner].

Based on these findings, the post-conviction court denied relief. This timely appeal follows.

## Analysis

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such

findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of

the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

On appeal, Petitioner contends that he was denied the effective assistance of counsel based on trial counsel's failure to move for a mistrial or request a curative instruction after counsel inadvertently played an audio recording for the jury that contained a reference to Petitioner as a "convicted felon." Petitioner argues that he was prejudiced by trial counsel's deficient performance because the jury was allowed to consider improper and damaging character information.

In order to establish prejudice resulting from trial counsel's failure to request a mistrial, Petitioner must show that such relief would have been granted. *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn. 2006) (noting that a petitioner must show both that the failure to file a motion was deficient and that the deficiency resulted in prejudice), *abrogated on other grounds by Brown v. Jordan*, 563 S.W.3d 196, 202 (Tenn. 2018). For a mistrial to be declared, there must be a manifest necessity for such action. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. Crim. App. 1981). When determining whether a mistrial was necessary after improper testimony, this court has often considered the following factors: (1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's case. *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). Here, Detective Burns' comment that Petitioner was a "convicted felon" was not elicited by the State. Although no curative instruction was given, the evidence as outlined by the post-conviction court linking Petitioner to the crime was strong. Petitioner has not established that the trial court would have granted a request for a mistrial trial and, thus, has failed to show any prejudice resulting from trial counsel's failure to request one. *Vaughn*, 202 S.W.3d at 120.

Regarding Petitioner's claim that trial counsel's performance was deficient based on his failure to request a curative instruction after Detective Burns' comment, trial counsel testified that he did not request such an instruction because he did not want the comment to be reiterated to the jury, and he explained that it was a tactical decision on his part not to request one. *See Granderson*, 197 S.W.3d at 790. In denying relief, the post-conviction court concluded that, "in hindsight," it would have been better for trial counsel to have asked for a curative instruction; however, review of counsel's performance requires that we must "eliminate the distorting effects of hindsight[.]" *Strickland*, 466 U.S. at 689. Thus, we agree with the post-conviction court's determination that Petitioner failed to show deficient performance based on trial counsel's failure to request a curative instruction.

- 11 -

Furthermore, Petitioner has not established prejudice under *Strickland*. As previously stated, the evidence against Petitioner was strong. The video surveillance from Gatlinburg-Pittman High School showed two individuals breaking into the school and using a variety of tools, including a tool with a forked end, to break into an ATM. One of the perpetrators displayed a very distinctive gait, and Petitioner was identified by this distinctive gait by an employee at a nearby market the same day as the break-in. When officers searched the van used by Petitioner and Mr. Way, they found tools consistent with those seen in the video surveillance and clothing that appeared to be the same or similar clothing worn by the perpetrators. Additionally, examination of the tools by the TBI crime lab determined that the forked tool found in the possession of Petitioner and Mr. Way made the marks on the door of the ATM and that paint chips on the forked tool and on a chisel were consistent with the paint from the ATM. When viewed in the context of the entire case, Petitioner has not shown, by a probability sufficient to undermine the outcome of the trial, that the results of the proceeding would have been different if trial counsel had requested a curative instruction. *See Goad*, 938 S.W.2d at 370. Petitioner is not entitled to relief.

## Conclusion

Based on the foregoing, we affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE